IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA **FILED**

AUG 1 4 2006

**U.S. DISTRICT COURT**
**CLARKSBURG, WV 26301**

DARLENE J. ROSE,
          Plaintiff,

v.                   Civil Action No. 2:05CV
                       (Judge Maxwell)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION/OPINION

Darlene J. Rose ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on the parties' cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Plaintiff filed an application for DIB on June 30, 2001 (protective filing date), alleging disability beginning February 11, 2001, due to degenerative disc disease, lower lumbar sprain, fibromyalgia, nerve damage to the left hand and fingers, irritable bowel syndrome, depression, low back pain, right leg weakness and numbness, possible carpal tunnel syndrome, left knee hyperreflexia and other neurological changes in back and legs, anxiety, fatigue, and chronic pain (R. 95). The claim was denied at the initial and reconsideration levels and a hearing was timely requested (R. 54, 56, 72). Administrative Law Judge Barbara Gibbs ("ALJ") held a hearing on January 28, 2003 (R. 509). Claimant, represented by counsel, appeared and testified, as did

Vocational Expert Eugene Czuczman ("VE"). The ALJ issued a decision denying benefits on February 21, 2003 (R. 63). On March 22, 2005, the Appeals Council denied Plaintiff's request for review (R. 7), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Plaintiff was born on June 10, 1953, and was forty-nine years old at the time of the ALJ's decision (R. 87). She graduated from high school and last worked for ten years for the West Virginia Department of Health and Human Resources as a Family Support Specialist (R. 110).

Plaintiff was seen at Camden on Gauley Medical Center as follows:

- January 29, 1979, for ear itchiness;
- December 20, 1979, for ear itchiness;
- July 13, 1981, for ear problems and tiredness;
- July 17, 1981, for left ear pain;
- January 13, 1982, for general physical;
- December 15, 1982, for dizziness and itching in ears;
- February 1, 1983, for low back pain with radiation;
- September 20, 1983, for tenderness and swelling in elbows;
- December 16, 1983, for migraine headaches and pain all over;
- January 3, 1984, for back pain which resulted from a fall;
- January 16, 1984, for occasional pressure in back caused by earlier fall;
- January 30, 1984, for low abdominal pain;
- February 24, 1984, for low back strain and headache;
- March 14, 1984, for headache and nausea;
- October 31, 1984, for cough and frequent urination;
- August 21, 1989, for ear itchiness;
- November 19, 1992, for chest congestion, sore throat, and irritable bowel;
- January 28, 1994, for dizzy spells of questionable etiology;
- February 3, 1994, for results of CT scan, which were normal, and for headaches, depression, and anxiety; and
- February 23, 1994, for stress and tension (R. 280, 384-408).

Plaintiff had a hysterectomy at Davis Memorial Hospital on April 7, 1989 (R. 345-46).

On December 9, 1993, F.T. Sporck, M.D., reported the electronystagmogram was a normal study and Plaintiff's reported dizziness was not related to an ear condition (R. 363).

2

Plaintiff was also treated at Camden on Gauley Medical Center as follows:[1]

- June 6, 1994, for eczema and anxiety (Docket Entry 18, p. 5 of 30);
- September 8, 1994, for anxiety, irritable bowel, eczema (Docket Entry 18, p. 6 of 30);
- February 8, 1995, for hot flashes and abdominal pain (Docket Entry 18, p. 8 of 30);
- April 20, 1995, for Hepatitis B vaccination (Docket Entry 18, p. 10 of 30);
- May 26, 1995, for second Hepatitis B vaccination and complaints of hemorrhoids (Docket Entry 18, pp. 10 and 11 of 30);
- July 19, 1995, for cough (Docket Entry 18, p. 12 of 30);
- August 14, 1995, for acute lumbar sacral sprain (Docket Entry 18, p. 12 of 30);
- September 27, 1995, for depression due to illness of father and right sided neck, shoulder, chest and arm pain caused by stress and overuse (Docket Entry 18, p. 13 of 30);
- December 4, 1995, for aches and pains all over, but no joint tenderness, and for which doctor "got the book out on fibrosis" to review trigger points (Docket Entry 18, p. 14 of 30);
- January 15, 1996, for possible fibromyalgia or arthritic condition (Docket Entry 18, p. 15 of 30);
- February 8, 1996, at which time she reported she was "getting some response from Daypro" and that Xanax was helping quite a lot" (Docket Entry 18, p. 16 of 30);
- June 12, 1996, for bronchitis (Docket Entry 18, p. 19 of 30);
- December 30, 1996, with grief and depression due to the death of her sister; possible carpal tunnel; possible peripheral neuropathy; and possible cervical arthritis (Docket Entry 18, p. 21 of 30); and
- January 20, 1997, for left cervical radiculopathy and examination of cervical spine, which was positive for "arthritis of the cervical spine but not too bad" (Docket Entry 18, p. 22 of 30).

On January 21, 1997, an x-ray was made of Plaintiff's cervical spine, which showed minimal degenerative changes of the lower cervical spine (R. 281).

On January 27, 1997, Plaintiff underwent a MRI of her cervical spine. It showed "C5-C6 narrowing of the central and lateral neural foramina secondary to combination of vertebral body osetophytes and herniated disc. C6-C7 level broad based disc herniation with moderate flattening of the thecal sac with narrowing of the antero-posterior narrowing of the thecal sac. Mild narrowing

---

[1] These records were submitted to the ALJ prior to the hearing (December 10, 2002). They were not contained in the record of evidence. Said records were provided to the Court by Plaintiff, who supplemented the record with lost documents. (See Docket Entries 10 and 17.)

of the central canal at C4-C5 secondary to bulging disc. . . . Normal disc spaces at C2-C3, C3-C4, and C7-T1 levels" (R. 283-84).

On February 28, 1997, Plaintiff was examined by John Schmidt, M.D., a neurologist. Plaintiff's chief complaint was for neck pain (R. 174). Dr. Schmidt observed Plaintiff to be in no acute distress, but tearful during the examination. Plaintiff had full range of motion in her neck. Her cranial nerves were intact; she had 5/5 strength; her gait was normal. Dr. Schmidt reviewed Plaintiff's cervical MRI and noted it demonstrated a "degree of degenerative spondylosis maximal at C5-6 and C6-7 with central protrusions of the discs," but "no distortion of the cord or significant spinal canal stenosis or lateral recess narrowing." Dr. Schmidt observed no instability. Dr. Schmidt's diagnosis was that Plaintiff was "likely . . . suffering from the effects of the degenerative spondylosis/chronic cervical strain but she does not have evidence of cervical radiculopathy/neuropathy/myelopathy." He suggested Plaintiff undergo an EMG of the left lower extremities and a MRI of her brain (R. 175).

On April 17, 1997, Dr. Schmidt again examined Plaintiff. He noted his examination results of Plaintiff were unchanged from his previous observations. He noted Plaintiff's persistent chief complaint was for neck and bilateral shoulder discomfort. He observed Plaintiff was stable neurologically and had no new weakness, tingling, or numbness in her extremities. Dr. Schmidt reviewed the MRI of Plaintiff's head and the EMG of her upper extremities and opined they failed to "demonstrate evidence of demyelinating disorder." He opined Plaintiff's MRI was normal and the EMG showed no carpal tunnel or cervical radiculopathy. Dr. Schmidt "believe[d] [Plaintiff] [was] suffering from the effects of fibrositis." He suggested she should be evaluated by and seek treatment through the "Behavioral Medicine Services regarding a depression." Dr. Schmidt released

4

Plaintiff from his care (R. 172).

On June 11, 1997, Raymond P. Coombe, M.D., completed an evaluation of Plaintiff at the Charleston Area Medical Center Pain Management Program based on her complaints of pain in her bilateral trapezius area, her rhomboid area, and down her arms. He observed "some tender trigger points" in Plaintiff's trapezius and rhomboid areas and discussed trigger point injections with Plaintiff (R. 442).

On August 4, 1998, Plaintiff was evaluated by Paul Bachwitt, M.D., for complaints of pain at her tail bone. Dr. Bachwitt noted Plaintiff had been previously diagnosed with fibromyalgia (upon self report) and was not a candidate for surgery (R. 176).

On August 11, 1998, Dr. Bachwitt noted Plaintiff's blood work was "very satisfactory" (R. 176).

On January 29, 1999, Plaintiff presented to Camden on Gauley Medical Center with complaints of constipation and hemorrhoids. Dr. Trenbath observed Plaintiff's tail bone was tender (Docket Entry 18, p. 25 of 30).

On February 8, 1999, Plaintiff presented to Glenelg Medical Center on referral from Dr. Trenbath. She complained of pain in her upper dorsal and in her lower lumbar spine (R. 355). It was observed Plaintiff was able to squat to the floor and rise without assistance. Plaintiff's heel drop was negative. Plaintiff could heel and toe walk (R. 357).

Also on February 8, 1999, Plaintiff underwent a cervicolumbar x-ray at Glenelg Medical Center. Plaintiff's lumbar spine was unremarkable. There was no space narrowing. Some hyperlordosis of Plaintiff's lumbar curvature was noted. There was mild degenerative joint disease in Plaintiff's cervical region and intervertebral elements with narrowing of disc spaces (R. 181).

The treatment notes of Nunzio P. Pagano, D.C., of Plaintiff revealed the following:

- February 10, 1999, treated for tail bone pain (R. 437);
- February 12, 1999, stated she was feeling "somewhat better" (R. 437);
- February 15, 1999, stated she was "doing fairly well" (R. 437);
- February 17, 1999, reported she was "some better" (R. 437);
- February 19, 1999, reported she had pain in her "dorsals, low back" (R. 438);
- February 22, 1999, reported she was doing better (R. 438);
- February 24, 1999, stated she experienced stiffness (R. 438);
- March 5, 1999, reported neck and tail bone pain (R. 439); and
- March 8, 1999, complained of pain at the right buttocks and right shoulder (R. 439).

On March 11, 1999, Plaintiff returned to Dr. Trenbath with complaints of having "good days and bad days." He diagnosed fibrositis and cervical disc disease with narrowing at C5-C6 and C6-C7. He instructed Plaintiff to continue with physical therapy, chiropractic treatment, and use of lumbar support (Docket Entry 18, p. 26 of 30).

On April 13, 1999, Plaintiff presented to Dr. Trenbath with complaints of neck pain. Dr. Trenbath treated Plaintiff with Anaprox (Docket Entry 18, p. 27 of 30).

On April 26, 1999, Dr. Pagano requested authorization for a Body Perfect II foam chair and a Tender Flo II Water Cushion for Plaintiff's use in treatment of degenerative joint disease and hyperlordosis (R. 440).

On June 21, 1999, Plaintiff presented to Dr. Trenbath with back pain. Dr. Trenbath diagnosed right cervical radiculopathy and right cervical muscle spasm. He injected Plaintiff with Solumedrol and prescribed Anaprox and Skelaxin (Docket Entry 18, pp. 28 and 29 of 30).

On July 22, 1999, Dr. Trenbath prescribed Elavil to Plaintiff (Docket Entry 18, p. 30 of 30).

On February 7, 2000, Plaintiff presented to Dr. Trenbath with complaints of low back pain and difficulty walking. He injected Plaintiff with Solumedrol, Demerol, and Phenergan and prescribed Anaprox, Skelaxin, and Elavil (R. 277-78).

On February 9, 2000, a x-ray of Plaintiff's lumbar spine revealed "no evidence of any acute

traumatic bony or joint pathology. . . . [m]inimal anterior lipping [was] noted at the level of L3-L4" (R. 285).

Also on February 9, 2000, Plaintiff was examined by Dr. Trenbath, who diagnosed low back strain. He reviewed Plaintiff's x-ray and noted it "look[ed] good." He recommended Plaintiff continue use of a TENS unit (R. 276).

On February 11, 2001, Plaintiff presented to Summersville Memorial Hospital's Emergency Department with complaints of low back pain and spasm (R. 187). She was examined by Dr. Bailes, who diagnosed acute lumbar strain and chronic disk disease (R. 195). Plaintiff was treated with Valium, Demerol, and Phenergan (R. 189, 195). Plaintiff was provided Percocet (R. 195). Plaintiff reported her pain had eased after she received medication. She was released (R. 189).

On February 12, 2001, Plaintiff reported to Dr. Trenbath that she had experienced sudden and severe back pain on February 11, 2001, and had reported to Summersville Memorial Hospital's Emergency Department. Dr. Trenbath diagnosed a ruptured disc and ordered a MRI (R. 272).

On February 16, 2001, Plaintiff underwent a MRI of her lumbar spine at Summersville Memorial Hospital. "[N]o abnormality was demonstrated" (R. 286). No bony or disc abnormalities were seen; no spondylolysis or spondylolisthesis was detected; there was normal alignment; there was no disc dessication or narrowing; no herniation was seen; the neural foramina was wide open; and there was no pressure on the nerve root (R. 286).

On February 21, 2001, Plaintiff was examined by Dr. Trenbath for severe back pain. Dr. Trenbath noted the MRI did not show a ruptured disc as he had diagnosed on February 12, 2001. He then diagnosed right sacroilitis and sacroiliac joint sprain. He prescribed Hydrocodone and injected Plaintiff with Celestone Soluspan and Xylocaine (R. 271).

On February 27, 2001, Plaintiff was treated at Central West Virginia Physical Therapy, Inc., upon referral from Dr. Trenbath, for back pain. Plaintiff reported she experienced constant right low-back pain, which radiated down both legs. It was noted Plaintiff ambulated with a limp (R. 184). It was also noted Plaintiff had a "significant decrease in spinal range of motion" and "decrease in segmental mobility at the L4-L5 spinal segment." Paul Harris, P.T., intended to treat Plaintiff with ultrasound, thermal agents, myofascial release techniques, and mobilization (R. 185).

On March 2, 2001, Plaintiff reported to Dr. Trenbath that she had been "moving around much better" and had been experiencing less sacroiliac joint pain. He diagnosed "right sacroilitis secondary to bending over" and prescribed Hydrocodone and Naprosyn (R. 270).

Plaintiff returned to Central West Virginia Physical Therapy, Inc., on March 8, 2001. It was noted she had shown "good progress," and she reported a "moderate decrease in pain" and that she felt better (R. 183).

On March 16, 2001, Plaintiff reported to Dr. Trenbath that she was "doing much better" and that physical therapy was helping her. He noted Plaintiff's recent MRI was "fairly normal." He diagnosed right sacroilitis and continued Plaintiff on the "same medications" (R. 269).

On March 21, 2001, Plaintiff received physical therapy at Central West Virginia Physical Therapy, Inc. Physical Therapist Harris noted Plaintiff no longer ambulated with a limp and had realized significant decreased tenderness in her low back. Physical Therapist Harris opined Plaintiff had "progressed very nicely with her program" and had met her goals. Physical Therapist Harris placed Plaintiff on "a home program" (R. 182).

On April 2, 2001, Plaintiff informed Dr. Trenbath that she was "not doing too well." She reported pain in her low back with radiation down her legs. Dr. Trenbath noted her MRI did not

show "anything specific." He noted Plaintiff moved well, but she experienced tenderness in the sacroiliac joint and across her lower back. Dr. Trenbath diagnosed tinea pedis and chronic low back pain. He referred Plaintiff to Dr. Schmidt, as requested by Plaintiff. Dr. Trenbath prescribed Hydrocodone and Elavil. He provided Plaintiff with Grifulvin, Lodine or Etodalac (R. 268).

On April 9, 2001, Dr. Trenbath observed that Plaintiff was "doing great." He noted she was dispensing her pain medications to herself throughout the day and using ice and heat on her back. Dr. Trenbath also noted Plaintiff had completed physical therapy and that "[t]hings [were] looking okay." Dr. Trenbath observed Plaintiff was moving around well. He diagnosed chronic low back pain with some sacroilitis and he continued the same treatment program, as that "seem[ed] to be working" (R. 267).

On April 24, 2001, Plaintiff presented to Summersville Memorial Hospital's Emergency Department with complaints of low back pain. She was examined by Dr. Bailes, who noted Plaintiff's most recent MRI was normal. He observed moderate tenderness in Plaintiff's low lumbar area and slight tenderness in Plaintiff's cervical occipital region. Dr. Bailes diagnosed low back pain and spasm and provided Plaintiff Demerol and Valium (R. 190).

Also on April 24, 2001, Plaintiff presented to Dr. Trenbath with reports of lower back pain. Plaintiff also reported numbness to the middle and ring fingers which was caused by a knife injury to her left hand. Dr. Trenbath diagnosed bilateral sacroilitis and injected Plaintiff with Decadron and Xylocaine. He also opined Plaintiff may have partially torn her hand tendon. He referred her to Dr. Shamblin (R. 264).

On April 27, 2001, Plaintiff was evaluated by Robert J. Crow, M.D. He diagnosed exacerbation of chronic low back and right leg pain. Dr. Crow noted Plaintiff's February, 2001,

9

MRI of her lumbar spine showed no acute change, no significant disc herniation, no foraminal outlet, or no canal stenosis (R. 198). Dr. Crow's neurologic examination revealed the following: Plaintiff was alert and "oriented x3"; Plaintiff was in no acute distress; she was comfortable; Plaintiff had significant antalgic gait on her left side; she had pain at right lateral hip with range of motion testing; Plaintiff refused to toe or heel walk; she had no midline percussible pain, no trigger point, and no spasm; her straight leg raise and cross straight leg raise were negative; Plaintiff's bilateral lower extremity motor exam was normal; she had intact and symmetric sensory examination in bilateral lower extremities; and her deep tendon reflexes were intact and symmetric at her knees and ankles (R. 198-99). Dr. Crow opined Plaintiff should treat her chronic low back and bilateral hip pain with NSAID's and muscle relaxers. He recommended referral to a pain clinic. Dr. Crow opined he "[saw] no reason for scheduled follow-up" (R. 199).

Also on April 27, 2001, Plaintiff reported to Dr. Trenbath that the injections had eased her pain "a little bit." Plaintiff reported to Dr. Trenbath that Dr. Crow informed her "there was not anything he could do" to treat her condition. Dr. Trenbath opined Plaintiff had a "very tender sacroiliac joint" and was in "severe" pain. He diagnosed bilateral sacroilitis and chronic low back pain. Dr. Trenbath injected Plaintiff with Toradol, Demerol, and Vistaril. He referred Plaintiff to a pain clinic. He prescribed Voltaren and Hydrocodone (R. 262).

On April 30, 2001, Plaintiff was evaluated by Manuel E. Molina, M.D., for a knife injury to her left wrist. Dr. Molina found Plaintiff's x-ray was unremarkable and referred her to a "nerve specialist" for treatment (R. 197).

Also on April 30, 2001, Plaintiff was evaluated by Daniel Wood, M.D., for a knife puncture to her left wrist. Dr. Wood noted Plaintiff had "complete and normal sensation in the entire medial

nerve distribution except . . . on the inner surface between the ring and long finger." He opined Plaintiff's "oppositional movement of thumb to all fingers [was] normal." Additionally, Dr. Wood observed that Plaintiff's "[f]inger adduction/abduction, flexion/extension [were] all normal." Dr. Wood informed Plaintiff that he thought she had "at least contused the nerve and possibly incised the lateral most aspect." He opined Plaintiff did not need surgical repair and that she would recover with conservative treatment (R. 239). Dr. Wood provided Plaintiff with a carpal tunnel splint (R. 238).

On May 4, 2001, Plaintiff reported to Dr. Trenbath that she had experienced "neurological changes of her right lower extremity." Dr. Trenbath observed tenderness at her sacroiliac joint area, numbness of her shin, hyper-reflexia of her left patella, and minimal reflex on her right. Dr. Trenbath opined Plaintiff's symptoms were "classic for a ruptured disc pinching the L4 nerve root." He referred Plaintiff to Dr. Weinstein (R. 260).

On May 7, 2001, Plaintiff was examined by Steven Shank, M.D. She complained of right low back pain into her buttocks, pain in her lower leg, occasional pain in her big toe, mild left low back pain, and her right leg giving out. Dr. Shank observed minimal tenderness over her spine, medium pain with extension, and marked loss of range of motion. Dr. Shank noted Plaintiff ambulated with a walker. He diagnosed low back pain. He recommended Plaintiff undergo a MRI of her lower spine and opined she may need a MRI of her cervical spine. Dr. Shank found Plaintiff was not able to work (R. 359).

On May 21, 2001, James D. Weinstein, M.D., a neurologist, corresponded with Dr. Trenbath relative to Plaintiff's low back pain and symptoms into her right lower extremity. Dr. Weinstein reviewed Plaintiff's 1997 MRI and noted it showed "some modest degenerative disease at 5-6 and

11

6-7." He also reviewed Plaintiff's lumbar MRI and noted it showed "no abnormalities." Dr. Weinstein wrote that his examination revealed "some hyperreflexia at the left knee, but no Babinski or clonus at the ankles" and "some decrease with a rather vague pattern on the right side of her body." Dr. Weinstein opined Plaintiff had "no problem with straight leg raising." Dr. Weinstein wrote he planned to order blood tests to assist him in evaluating Plaintiff for possible neuropathy, an EMG of lower extremities, nerve conduction study of lower extremity, and cervical MRI (R. 205).

On May 30, 2001, Plaintiff reported to Dr. Trenbath that she had been examined by Dr. Weinstein. She reported to Dr. Trenbath that her right leg "[gave] out on her." Dr. Trenbath diagnosed "right leg weakness and reflex changes consistent with some type of lesion." He advised Plaintiff to continue treatment with Dr. Weinstein (R. 258).

On June 1, 2001, Plaintiff returned to Dr. Wood with complaints of pain in her left hand and a "knot" on her wrist. Plaintiff informed Dr. Wood that "functionally her hand [was] normal." Dr. Wood observed Plaintiff could "move thumb and all fingers in every direction." Dr. Wood's planned treatment was to increase Plaintiff's Elavil "if that [was] ok with her family doctor" and arrange for a nerve conduction study if Plaintiff's condition did not improve in three to four weeks (R. 238).

On June 11, 2001, Plaintiff phoned Dr. Trenbath's office and informed him that her orthopedist suggested increasing her Elavil. Dr. Trenbath increased the strength of Plaintiff's prescription for Elavil to 25mg (R. 255).

On June 15, 2001, Plaintiff underwent a MRI of her cervical spine. It revealed "[m]oderate disc bulges, especially at C6-7 and to a slightly lesser degree at C5-6, causing moderate central canal stenosis and some mild to moderate bilateral neural foraminal narrowing" (R. 206).

Also on June 15, 2001, Plaintiff underwent an EMG (R. 207). Plaintiff's peroneal motor studies were normal bilaterally; her tibial motor study was normal on the right side; her sural sensory studies were normal bilaterally; and the "[e]lectromyography was normal and was not supportive of L3-S1 radiculopathy on either side." The EMG impression was for a normal study that was not "supportive of polyneuropathy or L3-S1 radiculopathy on either side" (R. 209).

Dr. Weinstein informed Dr. Trenbath, by letter dated June 21, 2001, that Plaintiff's cervical MRI revealed nothing that caused Plaintiff's "problems," her blood tests "were negative for either a prediabetic condition or a vitamin B-12 deficiency," and her EMG and nerve conduction tests were negative. Dr. Weinstein informed Dr. Trenbath that Plaintiff had reduced her pain medication, and her "numbness and weakness seem[ed] to be going away." Dr. Weinstein wrote he was "puzzled by what [was] going on" and wanted "more diagnostic input," so he referred Plaintiff to another neurologist (R. 203).

Dr. Weinstein referred Plaintiff to Dr. Shiv Navada by letter dated June 21, 2001. Dr. Weinstein wrote that he had found "nothing . . . to explain her transient weakness and numbness in her lower extremity" (R. 204).

On July 8, 2001, Plaintiff underwent a MRI of her brain. It revealed "[n]o evidence of demyelinating disease" and a "normal appearance of the brain" (R. 210).

On July 9, 2001, Plaintiff presented to Dr. Wood with pain in her left hand. Plaintiff informed Dr. Wood that her condition had not changed. Dr. Wood's plan of treatment included scheduling a nerve conduction study with Glenn R. Goldfarb, M.D., a neurologist (R. 238, 444).

On July 17, 2001, Plaintiff reported to Dr. Trenbath that the wrist "where she jabbed herself with a knife [was] a little more swollen." Dr. Trenbath noted Plaintiff was being treated by Dr.

Wood for her hand condition. Plaintiff reported to Dr. Trenbath that her low back pain and sacroilitis had "gotten a lot better." Dr. Trenbath noted Dr. Weinstein had opined, in a letter, that he could "not . . . explain exactly why [Plaintiff] [was] having symptoms" and that she should seek the care of another neurologist. Dr. Trenbath opined Plaintiff had "almost full range of motion" in her neck; no tenderness in her sacroiliac joints; no tenderness in her rhomboid muscles; a straight leg raising test that was ninety degrees, with no discomfort; brisk reflexes; and the ability to touch the floor. He also noted Plaintiff was "able to do a little bit of work, housework, she even rode her bike." Dr. Trenbath diagnosed neuropathy of Plaintiff's left hand that was being treated by Dr. Wood; improving neurological function of Plaintiff's lower extremities; and improved bilateral sacroilitis. He opined Plaintiff was making excellent progress. Dr. Trenbath also opined "[t]here [was] some question of whether or not she has fibromyalgia." He noted it was his "feeling . . . at the present time she [did] not seem to have that on examination today since the area is typically tender, fibromyalgia are not tender but it is possible that she has a tendency toward that condition." Dr. Trenbath thought "the disability might be of value" "because it [was] highly possible that her symptoms could get worse if she [went] back to work" (R. 254).

On July 23, 2001, Dr. Goldfarb conducted an EMG study of Plaintiff. He opined Plaintiff's left median motor distal latency was increased; left median sensory latency was increased; left ulnar motor was normal; and left ulnar sensory was normal. Dr. Goldfarb's impression was for "[i]ncomplete lesion of left median nerve in distal forearm most severely affecting sensory fibers to the 4th digit with lesser involvement of 2nd and 3rd digits" (R. 443).

On July 23, 2001, Plaintiff completed an Adult Activities Questionnaire. She noted she had difficulty sleeping at night. Plaintiff asserted she retired between 10:00 p.m. and 11:00 p.m., rose

at 8:00 a.m., and remained sleepy all morning as a result of poor sleep patterns and her medications. Plaintiff napped during the day and did not require any assistance with her personal needs and grooming. Plaintiff noted that she was walking better than she had been in the late winter and early spring of 2001 and did not use a wheelchair or walker (R. 126). Plaintiff wrote she prepared cereal, juice, coffee, and milk for breakfast; sandwiches for lunch; and full-course meals for dinner. Plaintiff had lost fifteen pounds, but reported she was stable with her medications and "eating okay." Plaintiff listed the following daily activities: laundry, dusting furniture, paying bills, mopping floor (when able), washing dishes, managing bank accounts, and running errands. Plaintiff noted when she experienced back pain, her husband and son assisted her with vacuuming, mopping and carrying laundry (R. 127). Plaintiff shopped for food, clothing, and medication for up to one hour at a time. Plaintiff wrote that she sometimes drove. Plaintiff wrote that she read newspapers for one-half hour per day; watched television for two to three hours per day; listened to the radio for one hour per day; and listened to records for two hours per day (R. 128). Plaintiff's hobbies included hunting, gardening, and shopping. She asserted she had been unable to "engage in any of these activities very much at all" because of tiredness, depression, and pain; however, Plaintiff noted she spent two hours per week pursuing her hobbies (R. 128-29). Plaintiff visited family and friends and received visits from family and friends once or twice per week for one to two hours. Plaintiff noted she left the house to shop, look for deer, go to the post office, visit her sister-in-law, or run other errands. Plaintiff asserted she had difficulty concentrating when she was "budgeting & paying bills" or when making financial decisions. Plaintiff asserted she became "fumbuzzled easily," took longer to complete tasks, and became anxious and nervous (R. 129).

On July 29, 2001, Plaintiff completed a Personal Pain Questionnaire. Plaintiff wrote her

"whole back [was] sore"; her arms were numb and tingled when she rose; she had pain in her legs; and she had finger, wrist and palm pain in her left hand. Plaintiff noted medication eased her pain and she was able to "do something in the house or go to the post office" once she took medication. Plaintiff described her back pain as "aching," her finger pain as "burning, stinging," and her neck pain as "dull . . ." and stiff. Plaintiff wrote she had to change her positions because sitting and walking caused her back and legs to "get sore & stiff." Plaintiff noted she experienced pain in her fingers when shy typed, peeled vegetables, or opened jars of food, and her neck and back hurt when she wrote, typed, or read. Plaintiff asserted "pain [was] always there, but decrease[d] about 1 ½ -2 hours after taking . . . medications" (R. 131). Plaintiff also asserted she treated her pain with whirlpool baths, heating pad, ice packs, neck pillow, and hot showers. Plaintiff wrote she was "refused" as a patient at a pain clinic in Charleston, West Virginia. Plaintiff asserted she became tired easily; specifically, after shopping for one hour, her legs felt weak and she experienced pain in them, and when she played with her grand children, tossing a ball with them made her tired. Plaintiff wrote she had difficulty focusing because of pain and exhaustion (R. 132).

On July 30, 2001, Plaintiff was examined by Dr. Wood, who reviewed the results of the EMG test Dr. Goldfarb performed on Plaintiff and noted the EMG showed "there [was] an incomplete lesion of left median nerve affecting sensory fibers to the 4th digit, less involvement of second and third" digits (R. 238). Dr. Wood informed Plaintiff it was "reasonable to explore this area" (R. 237-38). Dr. Wood explained to Plaintiff there was no laceration and that her nerve was "bound down by scar tissue." Dr. Wood intended to schedule and perform corrective surgery for Plaintiff's hand (R. 237).

On August 9, 2001, Plaintiff underwent exploration and neurolysis of her left median nerve

16

at the Charleston Area Medical Center. Dr. Wood dissected off and removed scar tissue from Plaintiff's left median nerve (R. 212).

On August 13, 2001, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The physician found Plaintiff could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds (R. 134). The physician found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 135-37). Plaintiff's RFC was reduced to medium (R. 138).

On August 17, 2001, Plaintiff returned to Dr. Wood for follow-up from her surgery of her left wrist. Plaintiff reported she still experienced some numbness to her fingers and Dr. Wood informed Plaintiff that her "fingers [would] feel better in time." Dr. Wood removed the sutures (R. 237).

On August 21, 2001, Plaintiff returned to Dr. Trenbath. She reported the August 9, 2001, surgery, which included the removal of "some adhesions," resulted in her "doing a little bit better." Plaintiff complained of fatigue and tiredness. Dr. Trenbath observed Plaintiff's "cranial nerves 3 through 12 [were] grossly intact." Her sensory to light touch was normal. Her motor examination "seemed to demonstrate some weakness. . . ." Dr. Trenbath diagnosed injury to Plaintiff's wrist; "fatigue and some lack of mental concentration possibly related to her medications"; persistent neck and low back pain; and proximal leg muscle weakness (R. 252).

On August 27, 2001, Plaintiff returned to Dr. Wood. He opined Plaintiff was "healing well." Her thumb and fingers movements were "excellent." Plaintiff informed Dr. Wood that she still experienced "decreased sensation in between the long finger and the ring finger, and Dr. Wood advised Plaintiff that it would "take months to improve." Plaintiff also informed Dr. Wood that she

had back pain, had a "'slipped disc' in her cervical region," and had numbness and tingling in both arms (R. 237). Plaintiff asserted that she was "being worked up for multiple sclerosis."

On September 18, 2001, Plaintiff reported to Dr. Trenbath with "lots of problems." She presented with a rash on her feet, itchy ears, intermittent back pain, restless leg syndrome, and restless arm syndrome. Dr. Trenbath observed Plaintiff was "moving around quite well . . . ." He diagnosed fibromyalgia, chronic low back pain, restless leg syndrome, tinea pedis, and itching ears. He prescribed Elocon, Griseofulvin, and Permax (R. 250).

On September 19, 2001, Plaintiff underwent an Adult Mental Profile, which was conducted by Robert J. Klein, Ed.D., a licensed psychologist (R. 214-17). Plaintiff's chief complaints were for chronic back pain, memory difficulties, difficulty staying focused, forgetfulness, and depression. Plaintiff described her symptoms as feeling anxious and depressed, having no energy, having poor appetite, experiencing some crying spells, feeling as if she could not do anything, not being able to work, wakefulness during night, feeling stressed, loss of interest in going places, but she denied suicidal thoughts and feelings of panic (R. 214). Plaintiff reported she was not receiving mental health care. Mr. Klein did not review any medical or treatment records of Plaintiff.

Plaintiff's appearance was appropriate and hygiene good. Plaintiff walked with a normal gait. Mr. Klein observed Plaintiff's attitude to be positive, cooperation to be good, social interaction was good, eye contact was good, length and depth of verbal responses were normal, and speech was relevant. Mr. Klein noted Plaintiff exhibited nervousness and laughed excessively (R. 215). Mr. Klein found the following: Plaintiff's affect was broad, mood was depressed, thought content was normal, thought process was normal, perception was normal, immediate memory was normal, recent memory was moderately deficient, remote memory was normal, concentration was mildly deficient,

18

psychomotor behavior was normal, and pace was normal (R. 216).

Plaintiff's Verbal IQ was 104; Performance IQ was 114; Full Scale IQ was 109 as scored on the WAIS-III. She scored the following on the WRAT-III: reading, spelling, and arithmetic were post high school equivalency (R. 216). Mr. Klein's diagnostic impression was that Plaintiff "met the necessary DMS IV [c]riteria for Generalized Anxiety Disorder and a Major Depressive Disorder, Moderate without Psychotic features." He opined Plaintiff's anxiety "appeared to have been at least present ten years ago and primarily appeared as a response to significant stress" and her depression "appeared to be closer to two years." Mr. Klein found the following: Axis I – major depressive disorder, moderate, recurrent without psychotic features; Axis II – no diagnosis; and Axis III – see medical records. His prognosis of Plaintiff was "guarded." Mr. Klein noted Plaintiff's daily activities were "[s]everely restricted due to physical condition"; social functioning was "restricted," but Plaintiff demonstrated good interaction with him during his evaluation. Mr. Klein concluded Plaintiff's concentration was moderately deficient; persistence was normal; pace was normal; immediate memory was normal; and recent memory was moderately deficient. Mr. Klein opined Plaintiff could manage her finances (R. 217).

On September 22, 2001, Samuel Goots, Ph.D., reviewed Plaintiff's medical and mental health records and completed a Psychiatric Review Technique of her. He found Plaintiff had affective disorders and anxiety-related disorders, impairments that were not severe (R. 218). Dr. Goots found Plaintiff's affective disorder was in the form of depression and her anxiety-related disorder was in the form of generalized anxiety disorder (GAD) (R. 221, 223). Dr. Goots found Plaintiff had no restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated

19

episodes of decompensation (R. 228).

On October 10, 2001, Plaintiff underwent a neurological consultation with Shiv Navada, M.D., a board-certified neurologist. Plaintiff's chief complaint was for leg weakness and pain syndrome. Plaintiff presented Dr. Navada with her "medical history that she had typed dating back to 1977," which "filled 12 full lengths of paper." Plaintiff informed Dr. Navada of the following: 1) she had lower back pain since 1977; 2) she had "'exhaustion' of back muscles'"; 3) it was difficult for her to remain in one position for more than one hour; 4) her back pain radiated to her hips; 5) Hydrocodone was the only "thing" she had found to ease her symptoms; 6) her back "' lock[ed] up' from time to time"; 7) she "believe[ed]" she had weakness in her legs; 8) her right leg, from knee to foot, became numb; 9) she had reduced arm strength; 10) she had difficulty gripping with her hands; 11) she experienced dizziness in the past; 12) she felt anxious and depressed; 12) she had impaired memory; 13) she had difficulty following directions; 14) she misplaced things; and 14) she had difficulty sleeping (R. 232-33).

Dr. Navada's general examination of Plaintiff revealed her weight to be one-hundred and seventy-two pounds; HEENT "disc margins were sharp"; cardiovascular had no murmur or carotid bruit; lungs were clear; and abdomen was soft. Dr. Navada's neurological examination of Plaintiff revealed that she was alert and oriented; her recall was three out of four; she could perform "serial 7's"; her interpretation was normal; and her affect was "somewhat" depressed. Plaintiff's cranial nerves were normal (R. 233). Plaintiff's motor examination revealed no atrophy and normal tone. She had minimal "give-way weakness of hand grip bilaterally." Her sensory exam was normal, reflexes were brisk, and plantar responses were flexor (R. 233-34). Dr. Nevada found Plaintiff's finger-to-nose test was normal; her gait was slow; she could perform deep knee bends; and she

walked on toes and on heels. Plaintiff's forward flexion was seventy degrees, extension was 20 degrees, and lateral tilt was fifteen degrees. Plaintiff's straight leg raising test caused pain, with no radiation, at seventy degrees (R. 234).

Dr. Navada reviewed the following medical test results: 1994 normal cranial CT scan; 1997 cervical spine x-ray, which revealed degenerative disc disease; 2000 lumbar spine x-ray, which revealed minimal anterior lipping at L3-L4 level; June 2001 cervical spine MRI, which revealed moderate disk bulge at C5-C7 and C5-C6; June 2001 normal EMG of legs; and July 2001 normal cranial MRI (R. 234).

Dr. Navada's impression was for low back syndrome, with subjective leg weakness; lumbar and cervical myofascitis; mild memory disturbance; depression/anxiety; and polyarthralgia. In summary, Dr. Nevada opined Plaintiff's examination was "essentially normal with the exception of tenderness of lumbar and cervical paraspinal muscles." He observed mild restriction of her lumbar range of motion. Dr. Navada opined Plaintiff's examination was "not suggestive of severe lumbosacral radiculopathy." Dr. Navada did not "absolutely rule out" a diagnosis of multiple sclerosis, but he felt it was "unlikely" Plaintiff had this condition because of the "absence of bulbar symptoms, the presence of pain syndrome and normal MRI" tests. Additionally, Dr. Navada opined "most of" Plaintiff's "symptoms [could] be explained on the basis of depression/anxiety and myofascitis" and noted "input of a psychiatrist [would] be worthwhile" (R. 234). Dr. Navada found Plaintiff's mild memory disturbances were related to depression. He opined it was "doubtful that [Plaintiff] [would] be able to return to her previous employment." Dr. Navada discharged Plaintiff from his care (R. 235).

On October 22, 2001, Plaintiff reported to Dr. Wood that her hand was "much better." She

experienced no burning sensation, but still had a little numbness. Plaintiff stated she was "very happy" with the results of the surgery. Dr. Wood observed Plaintiff's incision was healing well and opined he would examine her on an as-needed basis (R. 236).

On October 24, 2001, Plaintiff was examined by Dr. Trenbath for pain in her legs at night and pain in her back. He observed Plaintiff to be "quite stiff." Dr. Trenbath noted Plaintiff could not bend forward and her straight leg raising test was positive for low back pain. She complained of "tenderness in various points that [were] typical of fibromyalgia, specifically in the" trapezius, rhomboid, sacroiliac, and costochondral areas. Dr. Trenbath opined Plaintiff was "obviously anxious and depressed and somewhat tense." He diagnosed "chronic pain syndrome probably related to fibromyalgia with low back pain"; lumbar and cervical myofascitis; depression and anxiety; and fibromyalgia. He prescribed Hydrocodone, Voltaren, Paxil, and Kitra (R. 248).

On November 5, 2001, Plaintiff was evaluated by Kittra Burnham, L.P.C., L.C.S.W. (R. 243). Ms. Burnham noted Plaintiff had sought counseling because of her sister's death and had been treated with Zoloft during that period. Plaintiff informed Ms. Burnham that she was "stressed by work – overwhelmed" (R. 244). Plaintiff stated she "love[d] to hunt and camp" but had "only been a couple times last year." Plaintiff informed Ms. Burnham that she did not visit with family because she experienced pain and she was no longer active in the community because she was anxious and depressed. Plaintiff stated she "misse[d] her family in Ohio," having moved to West Virginia with her husband to care for his elderly parents (R. 245). Plaintiff asserted she had difficulty sleeping and eating; had difficulty concentrating; had difficulty staying on task; and had difficulty remembering. Plaintiff stated she had no interest and no energy. Ms Burnham noted Plaintiff was intelligent, was talkative, and had a good support system (R. 246). Ms. Burnham found Plaintiff had major

depression, severe; anxiety disorder NOS, and pain disorder with psychological factors and general medical condition. Ms. Burnham noted Plaintiff was going to follow-up with Dr. Trenbath and herself and opined she should continue medicating with Paxil so a determination could be made as to its effectiveness (R. 247).

On November 7, 2001, Plaintiff presented to Dr. Trenbath with complaints of stiffness, aches, and pains. She informed Dr. Trenbath that she was "doing a little bit better with her Paxil" as she was "a little less depressed." Dr. Trenbath observed Plaintiff looked "much better" and she moved "around well." He diagnosed mild depression, fibromyalgia, "chronic pain syndrome related to fibromyalgia associated with low back pain," and lumbar and cervical myofascitis. Dr. Trenbath prescribed Paxil (R. 242).

On December 7, 2001, Dr. Trenbath noted Plaintiff had "restless leg syndrome and [was] being bothered more by that problem." Dr. Trenbath noted "good pulses in [Plaintiff's] dorsalis pedis area and patellar reflexes were quite brisk." He diagnosed restless leg syndrome and prescribed Sinemet (R. 241).

On January 23, 2002, Plaintiff underwent an independent medical evaluation (orthopedic), which was conducted by Paul K. Forberg, M.D. (R. 457, 460). Plaintiff reported she had experienced back pain "'for years and years.'" Dr. Forberg noted that "[o]ver the course of time, [Plaintiff] has had multiple diagnostic tests including x-rays of the neck, x-rays of the back, MRI of the cervical spine, MRI of the lumbar spine, EMG and Nerve Conduction Velocity Studies, all of which do not show acute change but do show the usual progressive changes of aging" (R. 458).

Upon examination of Plaintiff, Dr. Forberg found Plaintiff was moderately overweight; her neck range of motion was within functional range; her low back range of motion was impaired,

"primarily in forward flexion"; and her range of motion of all peripheral joints were symmetrical and within normal limits. Dr. Forberg diagnosed fibromyalgia, major depressive disorder, generalized anxiety, restless leg syndrome, nonspecific back pain, nonspecific cervical spine pain, generalized osteoarthritis of the spine, and mitral valve prolapse by history (R. 459). Dr. Forberg opined Plaintiff would not be able to return to her past employment, could not "be gainfully employed in any capacity," and was "permanently and totally disabled" (R. 460).

On March 7, 2002, Hugh M. Brown, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight hour work day; sit for a total of about six hours in an eight hour workday; and push-pull unlimited (R. 297). Dr. Brown found Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and/or crawl (R. 298). Dr. Brown found Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 299-300).

On March 13, 2002, Frank Roman, Ed.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff was not significantly limited in her ability to understand and remember. Mr. Roman found Plaintiff was not significantly limited in her ability to: 1) carry out very short and simple instructions; 2) perform activities within a schedule, maintain regular attendance, and be punctual; 3) sustain an ordinary routine without special supervision; and 4) make simple work-related decisions (R. 304). Mr. Roman found Plaintiff was moderately limited in her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms; and ability to perform at a consistent pace without an unreasonable number and length of rest periods (R. 304-05). Mr. Roman found Plaintiff was not significantly limited in her ability to interact appropriately with the general public or her ability to ask simple questions or request assistance. He found Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. Mr. Roman found Plaintiff demonstrated no evidence of limitation in her ability to get along with coworkers or peers or her ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Mr. Roman found Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting or her ability to be aware of normal hazards and take appropriate precautions. Additionally, Mr. Roman found Plaintiff demonstrated no evidence of limitations in her ability to travel to unfamiliar places, use public transportation, set realistic goals, or make plans independently of others (R. 305). Mr. Roman opined Plaintiff was able to "perform . . . ADLs & follow 2-3 step work directions in a low stress setting" (R. 306).

In his Psychiatric Review Technique, Mr. Roman opined Plaintiff had affective and anxiety-related disorders (R. 308). He noted her affective disorder was a depressive syndrome, characterized by anhedonia or pervasive loss of interest in almost all activities, or appetite disturbance with change in weight, or decreased energy, or feelings of guilt or worthlessness, or difficulty concentrating or thinking (R. 311). Mr. Roman opined Plaintiff's anxiety-related disorder was a medically determinable impairment that was secondary to her physical symptoms (R. 313). Mr. Roman found Plaintiff was mildly restricted in her activities of daily living; moderately limited in her ability to maintain social functioning; and mildly limited in her ability to maintain concentration, persistence, or pace. Mr. Roman found Plaintiff had experienced no episodes of decompensation (R. 318).

On April 30, 2002, Plaintiff presented to Dr. Trenbath with complaints of "tight" neck muscles and swelling of her hands and foot joints. Dr. Trenbath observed Plaintiff's trapezius muscles and para-cervical muscles to be "quite tense." Dr. Trenbath noted Plaintiff had "tender points all over her in the back, chest and so forth." Plaintiff's lungs were clear and her pulse was regular. Dr. Trenbath diagnosed fibromyalgia and restless leg syndrome. He increased Plaintiff's dosage of Sinemet and Voltaren and prescribed Soma (R. 378).

On June 21, 2002, Plaintiff underwent a Disability Determination Evaluation, which was completed by Morgan D. Morgan, M.A., for the West Virginia Disability Determination Service (R. 329-35). It was noted that Plaintiff "supplied the information for the assessment" (R. 329). Plaintiff's chief complaint was she was "applying for disability due to chronic pain related to a herniated disc in her neck and degenerative vertebrae in her lower back," "suffering from curvature of the spine," and "being diagnosed with fibromyalgia" (R. 330).

Plaintiff reported she "suffer[ed] from chronic back pain," frequent arm and leg pain, and anxiety and depression. Plaintiff informed the evaluator that her back pain limited her ability to engage in daily activities; she had difficulty sleeping because of worry and back pain; her energy level was diminished; she cried infrequently; she had "mild suicidal ideations, but no serious thoughts"; and her appetite was good. She described her symptoms as she had been worried about health issues, finances, and family members; had ruminating thoughts at bedtime; and was a perfectionist, who had obsessive thoughts about orderliness. Plaintiff asserted her anxiety and depression had improved "in recent months" (R. 330).

Mr. Morgan noted the following during Plaintiff's mental examination: Plaintiff 1) demonstrated good hygiene; 2) was cooperative and compliant during assessment; 3) made good eye

contact; 4) was spontaneous; 5) giggled due to anxiousness; 6) was extroverted; 7) used relevant speech that was coherent and anormal pace; 8) was oriented to time, name, place, and date; 9) appeared mildly anxious in mood; 10) had a broad and normal affect; 11) displayed a good sense of humor; 12) denied thought disorders; 13) appeared to demonstrate mildly deficient insights; 14) demonstrated average judgment; 15) had normal immediate and recent recall; 16) had good remote recall; 17) had average concentration; and 18) displayed motor tension. Plaintiff's Verbal IQ was scored at 102; Performance IQ was scored at 122; and Full Scale IQ was scored at 111 (R. 332). Plaintiff scored at the post high school level in reading, spelling, and arithmetic (R. 333).

Mr. Morgan listed the following objective symptoms for Plaintiff: cooperative, compliant, mildly anxious mood, motor tension, frequent giggling when anxious, quite happy, normal affect, and good sense of humor. Mr. Morgan opined that it "was apparent that the client's insights into emotional issues may be problematic." Mr. Morgan's diagnosis were for Axis I – anxiety disorder NOS; Axis II – no diagnosis "with obsessive-compulsive personality features"; Axis III – reported fibromyalgia, herniated disc, degenerative disc disease, curvature of the spine, restless leg syndrome, mitral valve prolapse, and allergies (R. 334).

Plaintiff listed her daily activities as follows: she rose at 10:00 a.m.; spent the day at home; maintained personal hygiene; drove; performed "common household chores regularly" with help from spouse and other family members; and hunted, fished, camped, and read. Plaintiff informed Mr. Morgan that she had a "fair social network," which was "comprised of family members and friends" and was "active within the local volunteer fire department" (R. 334).

Mr. Morgan found Plaintiff's concentration was within normal limits; persistence was fair; pace was within normal limits; and immediate and recent memories were within normal limits. Mr.

27

Morgan found Plaintiff could manage her own finances (R. 335).

Morgan D. Morgan also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on June 21, 2002. Plaintiff was found to have no restriction in her ability to understand, remember, and carry out short, simple instructions. Plaintiff was found to have a slight restriction in her ability to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions (R. 336). Plaintiff was found to have a slight limitation in her ability to interact appropriately with the public. Plaintiff was found to have moderate limitations in her abilities to interact appropriately with supervisors, ability to interact appropriately with co-workers, and ability to respond appropriately to work pressures in a usual setting. Plaintiff was found to have marked limitation in her ability to respond appropriately to changes in a routine work setting. Mr. Morgan based this assessment on Plaintiff's "anxiety & obsessive-compulsive personality features" (R. 337).

On October 28, 2002, Plaintiff presented to Dr. Trenbath with complaints of pain in her low back, upper back, neck costochondral joints, knees and elbows. Plaintiff reported that she was "doing much better" and her "depression [was] better." Dr. Trenbath noted Plaintiff was "being followed by Monte VanNostrand and [was] to see psychological services in the future"; additionally, Dr. Trenbath opined he "[thought] this [would] help [him] take better care" of Plaintiff. Dr. Trenbath observed tender points, limited range of motion in neck, clear lungs, and regular heartbeat.

Dr. Trenbath noted Plaintiff moved "around well without too much stiffness or problems." His assessment was for "[f]ibromyalgia most likely with the history she has given"; restless leg syndrome "controlled with Sinemet"; and "[c]omponent of agoraphobia, panic disorder, depression and so forth." Dr. Trenbath noted he would "await the psychological testing that may help determine

28

possible change of medication." He prescribed anti-inflammatory medications and vitamins (R. 380).

On October 30, 2002, Andrew Steward of Cardinal Psychological Services contacted Dr. Trenbath's office and requested a referral for a psychological evaluation of Plaintiff (R. 379).

On October 31, 2002, Dr. Trenbath referred Plaintiff to Cardinal Psychological Services for an evaluation as per Mr. Steward's request (R. 379).

On November 5, 2002, Plaintiff was evaluated at Cardinal Psychological Services upon referral by her counsel to "assess [Plaintiff's] current level of functioning as it pertains to her Social Security/Disability appeal" (R. 409). The evaluation was conducted by Frances Allen Henderson, L.S.W., M.A., and L. Andrew Steward, Ph.D. (R. 417). Plaintiff informed the evaluators that she had been diagnosed with depression, anxiety, "'back pain and fibromyalgia,'" and "'herniated discs and degenerative disc disease and it cause[d] [her] hands and arms to hurt all the time'"(R. 409-10). Plaintiff reported Drs. Trenbath, Crow, and Schmidt had diagnosed her with fibromyalgia and that "a doctor in Clarksburg, West Virginia had previously diagnosed her with mitral valve prolapse" (R. 410). Plaintiff reported that "'medications and staying away from stress' seem[ed] to help with the problem." Plaintiff informed Ms. Henderson and Dr. Steward that "the physician has placed the following restrictions on her daily and work related activities: 'tolerate work as I can and avoid stress'" (R. 409). Plaintiff reported she had experienced a motor vehicle accident in "'the early 1980's,'" had "'fallen several times on her tailbone on ice'" and "'had seizures due to toxemia with [her] first pregnancy'" (R. 410).

Plaintiff reported the following social and daily activities to Ms. Henderson and Dr. Steward: it took her longer to complete chores as she took breaks and needed assistance; she cooked "'with

29

modifications'" in that she "'overcook[ed]'" and froze meals on her good days; she drove short distances; her hands went numb and she switched positions frequently; she awoke hourly during sleep; she had gained weight; and she had poor concentration and low energy (R. 412-13).

The evaluators observed Plaintiff was oriented in all five spheres, her eye contact was normal, and her psychomotor activity was below average. Plaintiff's speech was observed to be "tangential at times"; attention was average; concentration was average; immediate and long-term memories were in tact; short-term memory was impaired; abstract thought was normal; affect was anxious and depressed; and no psychosis present. Plaintiff's reported mood was "'average.'" As scored on the WAIS-III, Plaintiff's Verbal IQ was 96; Performance IQ was 113; and Full Scale IQ was 103 (R. 413). Plaintiff scored post high school in reading, post high school in spelling, and high school in arithmetic on the WRAT-III (R. 414). Plaintiff's score of thirty-seven on the Beck Depression Inventory-Revision Two test, based on her self-reported symptoms of feeling sad, feeling discouraged about the future, recognizing past failures, getting little pleasure out of things she used to enjoy, feeling guilty, being disappointed in herself, criticizing herself, crying more than she used to do, feeling restless, experiencing difficulty in becoming interested in anything, difficulty in making decisions, sleeping more, being more irritable, craving food, having difficulty in concentrating, feeling fatigued, and being less interested in sex, indicated severe depression (R. 415-16).

Plaintiff's score of twenty on the Beck Anxiety Inventory was based on her self-reported feelings of mild symptoms of "wobbliness in her legs," "fear of the worst happening, dizziness or lightheadedness, heart pounding or racing, being unsteady, fear of losing control, difficulty breathing, indigestion or discomfort in . . . abdomen, feeling faint, and sweating." Plaintiff's score of ten on

the Beck Hopelessness survey was based on her self-reported feelings of failure, unluckiness, unhappiness, and dissatisfaction (R. 416). Ms. Henderson and Dr. Steward's findings were as follows: Axis I – adjustment disorder with mixed anxiety and depressed mood and pain disorder associated with both psychological factors and a general medical condition; Axis II – no diagnosis: Axis III – see review of medical record; Axis IV – occupational problems; and Axis V – GAF 60 (R. 416-17).

Ms. Henderson and Dr. Steward's summary was as follows: Plaintiff was functioning at the average range of intelligence; she did not appear to be learning disabled; Plaintiff learned "more efficiently through hands-on instructions"; Plaintiff was "significantly depressed and anxious"; and she had difficulty with short-term memory. Their recommendation was as follows: Plaintiff should receive individual counseling, should be taught deep-breathing techniques and coping skills to "combat her depressive and anxiety symptoms," and should be referred to a pain clinic (R. 417).

Ms. Henderson and Dr. Steward completed a Psychiatric Review Technique of Plaintiff on November 17, 2002. They found Plaintiff had affective and anxiety-related disorders (R. 418). They opined Plaintiff's affective disorder was a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, or appetite disturbance with change in weight, or sleep disturbance, or psychomotor agitation or retardation, or decreased energy, or feelings of guilt or worthlessness (R. 421). Plaintiff's anxiety-related disorder was generalized persistent anxiety accompanied by motor tension, or autonomic hyperactivity, or apprehensive expectation (R. 423). Ms. Henderson and Dr. Steward found Plaintiff's restriction of activities of daily living were markedly limited; her ability to maintain social functioning was markedly limited; her ability to maintain concentration, persistence or pace was markedly limited; and she had experienced three

31

episodes of decompensation (R. 428).

Also on November 17, 2002, Ms. Henderson and Dr. Steward completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities of Plaintiff. The evaluators found Plaintiff was moderately limited in her ability to understand, remember, and carry out short, simple instructions and ability to exercise judgment or make simple work-related decisions. They opined Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions (R. 432). Ms. Henderson and Dr. Steward found Plaintiff was moderately limited in her ability to sustain attention and concentration for extended periods of time. They opined Plaintiff was markedly limited in her ability to maintain regular attendance and punctuality, ability to complete a normal workday and workweek without interruptions from psychological symptoms, and ability to perform at a consistent pace without an unreasonable number and length of work breaks (R. 433). Ms. Henderson and Dr. Steward found Plaintiff was slightly limited in her ability to respond appropriately to direction and criticism from supervisors, her ability to maintain acceptable standards of courtesy and behavior, her ability to relate predictably in social situations in the workplace without exhibiting behavioral extremes, and her ability to ask simple questions or request assistance from coworkers or supervisors. They opined Plaintiff was moderately limited in her ability to interact appropriately with the public, her ability to work in coordination with others without being unduly distracted by them, and her ability to work in coordination with others without unduly distracting them. Ms. Henderson and Dr. Steward found Plaintiff was markedly limited in her ability to demonstrate reliability and had no limitations in her ability to maintain acceptable standards of grooming and hygiene (R. 433-34). The evaluators found Plaintiff was moderately limited in her ability to respond to changes in the work setting or work process and her ability to be aware of

32

normal hazards and take appropriate precautions (R. 434). Ms. Henderson and Dr. Steward found Plaintiff was slightly limited in her ability to set realistic goals and make plans independently of others. They opined Plaintiff was moderately limited in her ability to carry out an ordinary work routine without special supervision and in her ability to travel independently in unfamiliar places. Ms. Henderson and Dr. Steward found Plaintiff had a marked limitation in her ability to tolerate ordinary work stress. They opined Plaintiff's limitations existed from February 11, 2001, to the present, which was November 17, 2002 (R. 435).

On December 30, 2002, Dr. Trenbath completed a Residual Functional Capacity Assessment of Plaintiff. Instead of noting Plaintiff's past relevant medical history, present diagnoses, and the clinical findings and laboratory tests on which the diagnoses were based, Dr. Trenbath instructed to "see old records" for that information (R. 445). Dr. Trenbath noted the following impairments and symptoms alleged by Plaintiff: "[u]nconfirmed fibromyalgia," restless leg syndrome, low back syndrome with subjective leg weakness, lumbar and cervical myofascitis, surgery of left wrist/hand, moderate disc bulges at C6-7 and C5-6, moderate central canal stenosis, low back pain, neck pain, leg pain, intermittent decreased back range of motion, lumbosacral muscle spasms and strain, arm numbness and pain, past diagnosis of mitral valve prolapse, history of headaches, history of irritable bowel syndrome, adjustment disorder with mixed anxiety and depressed mood, and pain disorder associated with both psychological factor and general physical condition. Dr. Trenbath noted the above listed impairments and symptoms provided by Plaintiff were consistent with his clinical records and observations (R. 446). Dr. Trenbath opined Plaintiff was incapable of doing heavy, medium, light, or sedentary types of work activity. Dr. Trenbath opined Plaintiff had to alternate positions frequently in that she had reported that she alleviated her pain by alternating sitting,

standing and lying down. Additionally, Dr. Trenbath opined Plaintiff required a sit/stand option (R. 447). Dr. Trenbath opined Plaintiff could sit for one hour, stand for forty-five minutes, and walk for ninety minutes. Dr. Trenbath found Plaintiff could "be up on . . . her feet" for a total of two hours in an eight-hour workday. Dr. Trenbath also found it was advisable or necessary for Plaintiff to lie down and to have frequent rest periods during a day. Dr. Trenbath opined Plaintiff could climb for twenty minutes and balance for one to two minutes. He opined Plaintiff could infrequently stoop, bend, kneel, crouch, crawl, stretch, reach, and squat during an eight-hour workday (R. 448). Dr. Trenbath found Plaintiff was restricted in using machinery, in her exposure to cold or hot temperatures, in her exposure to fumes and dust, and in her exposure to environmental hazards. Dr. Trenbath found Plaintiff was not restricted in her exposure to excessive humidity or noise. Dr. Trenbath opined Plaintiff would experience chronic moderate pain and severe intermittent pain because of her impairments (R. 449). Dr Trenbath found Plaintiff needed to frequently elevate her feet to relieve pain and numbness. He opined Plaintiff could perform repetitive movements with her feet and legs and could perform repetitive movements, such as simple grasping and using arm controls, with her hands. Dr. Trenbath found Plaintiff could not perform fine manipulation with her hands (R. 450). Dr. Trenbath found Plaintiff had loss of grip strength and numbness in her hands. Dr. Trenbath opined Plaintiff could not perform any full time job due to pain. Additionally, Dr. Trenbath found Plaintiff's depression, in combination with her other impairments, caused a greater degree of disability (R. 451). Dr. Trenbath opined Plaintiff was disabled from all full time work as of February 11, 2001 (R. 452).

On January 14, 2003, Plaintiff underwent a cervical spine MRI. It showed cervical spondylosis causing some cord flattening and foraminal encroachment (R. 453).

34

At the administrative hearing, held on January 28, 2003, the ALJ asked the VE the following series of hypothetical questions:

ALJ: . . . I want you to assume a person of [Plaintiff's] age, educational and vocational profile who could do light work. She could do postural activities occasionally and she would need to have the option to sit or stand during the course of a workday. Are there jobs that such a person could do?

VE: . . . The following would be a sampling that would, would fit within the hypotheticals given. Light, semi-skilled, SVP 3 as a case aide, 70,000 national, 900 regional. . . . Customer service clerk, 150,000 national, 2,000 regional, light, SVP 4, so it is semi-skilled. . . . Cleaner/polisher, light, SVP 2, so unskilled, 95,000 national and regionally you're looking at 1,000. Assembler, printed products, light, SVP 2, 80,000 national, 700 regional.

ALJ: . . . I want you to assume a person again of the claimant's age, education and vocational profile. This person could do sedentary work with the same limitations, that is postural activities occasionally with a sit/stand option. Are there jobs that this person could perform?

VE: . . . The following would be a sampling that would fit within the hypotheticals given. Type copy examiner, 90,000 national and regional, we're looking at over 500. Document preparing for microfilm, 60,000 national, 400 regional. . . . Taper printed, circuit layout . . . . 60,000 national and you have 400 for the region. . . .

ALJ: If we added to the hypotheticals the limitation that this person must work in a low stress environment, and by that I mean unskilled work, routine, repetitive processes dealing with things primarily but certainly not exclusively. How would that effect [sic] the availability of the jobs that you've named?

VE: Well, it would prevent any of the positions that I gave that were semi-skilled. . . . Obviously, because they're unskilled. However, it would not effect [sic] the unskilled work as the taper for printed circuit, type copy examiner or document preparer for microfilm in the sedentary. In the light exertional it would not effect [sic] the polisher, would not effect [sic] the assembler of printed products. . . .

ALJ: . . . If this person was limited to postural activities rather than occasionally it would be less than occasionally or infrequently. How would that effect [sic] the jobs that you've named?

VE: In the sedentary positions it's not going to have an effect. . . . There is frequent reaching involved with the assembler of printed products, so that would make that difficult to perform.

ALJ: So it would eliminate that job?

VE: Yeah. Cleaner/polisher too, you're reaching for the product, your reaching . . . within hands

35

reach, it's not beyond that, but you can . . . you're bringing it to you.

ALJ:   So it's going to eliminate the light jobs?

VE:   It's going to eliminate, yeah. . . .

ALJ:   How would it . . . effect [sic] the case lady or the customer service clerk at the light level?

VE:   It wouldn't. . . .

ALJ:   If this person needed to avoid concentrated exposure to vibration, how would that effect [sic] the availability of these jobs?

VE:   None of the jobs I utilized would have any vibration involved.

ALJ:   How many of these jobs require fine manipulation with the hands?

VE:   Well, type copy examiner is grasping, taper is more pinching. Document preparer would require some fine manipulation. . . . Cleaner/polisher is grasping. Assembler, printed products would have some occasional fine manipulation. When you have a product that you have to fold several times in order to complete it, so I could see that there.

ALJ:   . . . If these jobs required someone not to be – not to have . . . concentrated exposure to pulmonary irritants such as gasses, fumes, dust, bad ventilation, that kind of thing, would that effect [sic] the availability of any of the jobs that you named?

VE:   Yes. It would prevent the one as the cleaner/polisher. That would be the only one because the printed, assembler of printed products is a different area away from the printed, the actual products itself. So they're not exposed to . . . any type of pollutants.

ALJ:   If this person needed to avoid concentrated exposure to temperature extremes, wetness or humidity, noise or hazards such as unprotected heights or dangerous machinery, how would that effect [sic] the availability of these jobs?

VE:   . . . If it's extreme it has no effect. These are all controlled environments.

ALJ:   Now if this person had to be off task more than one unscheduled hour per day in which you, I believe, have identified in the past as being about one-third of the day . . . [d]ue to pain or fatigue and drowsiness, crying spells . . . for . . . demonstration of any of the limitations marked . . . in Exhibit . . . 33F(24) and it runs to 33F(27). If a person had to be off task for any of those reasons for more than one-third of the day, how would that effect [sic] the availability of the jobs that you've named?

VE:   It would prevent her ability to do the jobs.

36

ALJ:  . . . Now, assume that I find that all of [Plaintiff's] allegations and impairments are credible and supported by medical evidence. Are there any jobs that a person like her could do?

VE:  Not full time. . .

ALJ:  Let's assume that this person can't reach. Are there jobs at the sedentary or light level that a person who couldn't reach, and who has the other limitations enunciated in the hypotheticals that I gave you, that this person could do?

VE:  Well, are we including the hypothetical with the off task for more than –

ALJ:  No, no. Just the first two hypotheticals.

VE:  Okay. Well, the first two hypothetical we're saying no reaching or only a limited, infrequent reaching?

ALJ:  Well, let's do it both ways. No reaching?

VE:  No reaching would be not possible.

ALJ:  That eliminates all jobs.

VE:  Yes. . . . Because you have to at least to some limited degree reach for something during a day.

ALJ:  If the reaching can be done occasionally in all directions except overhead, how does that effect [sic] the availability of the jobs?

VE:  Well, it's not going to prevent the type copy examiner. It is going to prevent the taper, printed circuits, it is going to prevent the document preparer. Is [sic] will prevent the assembler for printed products. . . . It would not effect [sic] the cleaner/polisher, that could be done with occasional.

ALJ:  And if – but if the hypothetical, the limitation is occasional reaching period in all, in all directions – [h]ow does that effect [sic] the availability of the job?

VE:  Just as I mentioned. It wouldn't prevent those few jobs I brought up. . . . It would not prevent the type copy examiner, it would not prevent the cleaner/polished [sic] that was previously mentioned.

ALJ:  Would it . . . prevent the type of printed circuit?

VE:  It would because . . . it would be occasional. . . .

ALJ:    . . . And the same would go for the document preparer and the assembler?

VE:     Yeah. Because you're taking the documents, you have to take the stables out, then you reach to grab the other documents, and you have more of a flow going on with that and you could say occasional. Done occasional at times.

ALJ:    . . . Are there jobs that someone at the light or sedentary level who is limited to occasional reaching, but not overhead – and the same limitations that we set out on the first two hypotheticals for [Plaintiff], are there jobs that this person can do?

Atty:   You're not putting any manipulation in there?

ALJ:    No. We've already go – no, I'm not putting that in at this point.

VE:     Photographic machine operator, light, SVP 2, so it's unskilled. Folding machine operator, light, SVP 2, 75,000 national, 1,000 regional. I'm sorry, there's 800 for West Virginia. . . . Photographic machine operator, 80,000 national, 2,000 regional. . . .

ALJ:    . . . Let's go onto the sedentary jobs. Are there other light jobs?

VE:     Yes, there is. . . . Laminator I, 75,000 national, 400 regional. . . . Mounter by hand. . . . That's what photo film, using the machine. Once you load the machine you push a button, it cuts the film into it, the lengths. It's 95,000 national, regional you have 500 . . . . Surveillance system monitor, SVP 2. You have 200,000 national and regional you have over 3,000.

ALJ:    . . . Now, the last five jobs you gave me – at the light and sedentary level, how would the limitation as to with occasional – or no fine manipulation with the hands, how would that effect [sic] the availability of these jobs? I assume . . . the mounter by hand it would eliminate?

VE:     . . . No, that should work because once you put the roll on the spindle, which is grasping not fine manipulation . . . the machine does everything else. . . . Pushing the button to cut with and you're observing what the tape looks like and the photo looks like. So that wouldn't have any effect on any of them. There wouldn't be any fine manipulation.

ALJ:    . . . Are all of these done in a closed environment or controlled environment?

VE:     Yes. Controlled environment it is done.

ALJ:    Do any of them involve vibration?

VE:     No. . . .

ALJ:   Pulmonary irritants such as those I named earlier?

VE:    No, there wouldn't be. Because even with the photograph machine operator it's a film that you're putting in, not the – not any type of dyes at all with that.

ALJ:   . . . And would they all accommodate the low stress or can they all be done in a low stress environment?

VE:    Yes, they can be. . . .

Atty:  . . . I believe if I'm not mistaken you asked him to look at the mental assessment from Cardinal. But I don't believe you asked him to look at the assessment from the treating physician.

ALJ:   Well, the assessment from Cardinal was mental and the treating physician is physical. And all of these last – the pulmonary irritants and all that business came right out of the treating physicians –

Atty:  Well, I'd like for him to assume in combination. . . .

ALJ:   In combination if this person cannot do fine manipulation with her hands, cannot have exposure to environmental – well, if she's limited in all of the environmental areas, if she cannot have exposure to vibration, cannot have exposure to pulmonary irritants such as those I named, if she can do postural activities infrequently and all of those limitations cause her to be off work more then [sic] one-third of the day, off task more than one-third of the day, how does that effect [sic] the availability of the jobs that you've named?

VE:    It prevents her ability to be able to perform any job competitively (R. 563-90).

### III.  Administrative Law Judge Decision

The ALJ made the following findings:

1.     The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.     The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.     These medically determinable impairments do not meet or medically equal one of the

listed impairments in 20 CFR Part 404, Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth above in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.  The claimant has the following residual functional capacity: sedentary work with a sit/stand option at a low stress level (unskilled work with routine and repetitive processes involving things rather than people) that require postural activities only occasionally.

8.  The claimant is unable to perform any of her past relevant work (20 CFR § 505.1565).

9.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

10. The claimant has a "high school education" (20 CFR § 404.1564).

11. The claimant has transferable skills from skilled work previously performed as described in the body of the decision.

12. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.29 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a type copy examiner, with 90,000 jobs in the nation economy and 500 jobs in the regional economy, as a document preparer for microfilm, with 60,000 jobs in the national economy and 400 jobs in the regional economy and as a taper of printed circuit layouts, with 60,000 jobs in the national economy and 400 jobs in the regional economy. The vocational expert testified that the above jobs and the claimant's residual functional capacity did not conflict with the Dictionary of Occupational Titles.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 1520(f)) (R. 45-46).

## IV. Contentions

Plaintiff contends:

A.  The ALJ failed to consider all Plaintiff's impairments in combination, fragmenting the claimant's limitations;

B.  The ALJ failed to afford appropriate weight to the opinion of treating physician Richard Trenbath who opined in part that the Plaintiff could only infrequently stretch or reach and needed the opportunity to recline during the day;

C.  The ALJ failed to evaluate fibromyalgia/chronic fatigue syndrome pursuant to SSR 99-2p; and

D.  The ALJ did not include in the hypothetical question the limitations from the only mental assessments in the record from examining psychologists nor the specific work limitations from the only RFC of the an [sic] examining doctor, the treating physician.

Defendant contends:

A.  The ALJ's decision demonstrates that she considered Plaintiff's impairments in combination;

B.  Substantial evidence supports the ALJ's finding that Dr. Trenbath's opinion was not entitled to significant weight;

C.  The ALJ properly considered Plaintiff's alleged fibromyalgia; and

D.  The ALJ's hypothetical question included all of the limitations supported by the reliable evidence of record.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Combination of Impairments/Hypothetical

Plaintiff first contends the ALJ failed to consider all her impairments in combination, fragmenting her limitations. Defendant contends the ALJ's decision demonstrates that she considered Plaintiff's impairments in combination. The Fourth Circuit has held that the Commissioner must consider the combined effect of a claimant's multiple impairments and cannot fragment them. Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989).

Plaintiff argues:

> In cross examining the vocational expert the ALJ asked approximately a 14 different hypothetical questions in many of which she fragmentized the plaintiff's limitations. R. 567-591. The ALJ further interfered in counsel's ability to ask the vocational expert to consider the combined physical limitations in Dr. Trenbath's Residual Functional Capacity Assessment form [R. 445-452]. R.584. The hypothetical question relied upon by the ALJ omitted most of the specific work limitations contained in the RFC of Dr. Trenbath and the only two assessments from examining psychologists in the record. There is no substantial evidence to support the finding that there are jobs that the impaired plaintiff could still perform.

(Plaintiff's brief at 11). A review of the hearing transcript indicates the ALJ asked the VE:

1. A hypothetical with a light exertional level with occasional postural activities and a sit/stand

option.

2. A hypothetical at the sedentary exertional level with occasional postural activities and a sit/stand option.

3. A hypothetical adding to the above a low stress work environment doing unskilled, routine, repetitive work dealing primarily with things. The VE testified that would eliminate the skilled work, but there would still be jobs available.

4. A hypothetical further adding a limitation on posturals to "less than occasional or infrequent." The VE testified that additional limitation would not affect the sedentary positions or the light customer service clerk job named.

5. A hypothetical further adding a need to avoid concentrated exposure to vibration. The VE testified none of the jobs he named involved vibration.

6. A hypothetical further adding a limitation on fine manipulation. The VE testified that limitation would not eliminate the type copy examiner or taper or cleaner/polisher, but would limit the document preparer jobs.

7. A hypothetical further adding a limitation on concentrated exposure to pulmonary irritants. The VE testified that would eliminate only the cleaner/polisher job.

8. A hypothetical further adding a limitation on concentrated exposure to temperature extremes, wetness, humidity, noise and hazards. The VE testified that limitation would have no effect on the jobs named.

9. A hypothetical further adding that the hypothetical person would be off task more than one unscheduled hour per day (or more than one-third of a workday.) The VE testified that limitation would eliminate all the jobs named.

10. A hypothetical further adding a limitation that the person could not reach (but omitting the limitation regarding being off task in #9 above). The VE testified that with "no" reaching the person could not work. With occasional reaching in all directions except overhead the person could perform the type copy examiner job, but not the document preparer or taper.

11. A hypothetical changing #10 above to a limitation on reaching in all directions to only a few times a day. The VE testified that limitation eliminated all the named jobs.

12. A hypothetical changing #'s 9 and 10 to "occasional reaching." The VE testified this eliminated the type copy examiner job, but not the document preparer or taper.

The undersigned finds this sequence of hypotheticals did not "fragment" Plaintiff's impairments and limitations as she argues. Instead, the hypotheticals were cumulative, each one adding a limitation to those the VE already considered (except where the ALJ expressly omitted or changed a previous limitation). It also appears from the record that the VE understood the hypotheticals as asked and added or removed available jobs with each subsequent question.

The ALJ found Plaintiff could perform the jobs of type copy examiner, document preparer, and taper of printed circuit layouts. A review of the sequence of hypotheticals shows the ALJ therefore rejected the limitation to occasional (or less frequent) reaching in all directions except overhead; the limitation on fine manipulation; and the limitation regarding being off task one-third of the day. According to the VE, the three jobs upon which the ALJ relied in her decision were at the sedentary exertional level; involved less than occasional or infrequent postural activities; had a sit/stand option; were low stress, unskilled, routine, repetitive work dealing primarily with things rather than people; did not involve vibration; did not involve a concentrated exposure to pulmonary irritants; and did not involve a concentrated exposure to temperature extremes, wetness, humidity,

noise or hazards.

The undersigned finds the ALJ did not fragment Plaintiff's limitations in her hypotheticals to the VE, and did consider Plaintiff's impairments and limitations in combination.[2]

### C. Dr. Trenbath's Opinion

Plaintiff next argues: "The ALJ failed to afford appropriate weight to the opinion of treating physician Richard Trenbath who opined in part that the Plaintiff could only infrequently stretch or reach and needed the opportunity to recline during the day." Defendant contends substantial evidence supports the ALJ's finding that Dr. Trenbath's opinion was not entitled to significant weight.

In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. § 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>>
>> <u>By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight</u>.

(Emphasis added).

There is no dispute that Dr. Trenbath is Plaintiff's treating physician. He has treated her regularly for many years, for all of her impairments, physical and mental. In December 2002, Dr.

---

[2]The remainder of Plaintiff's argument on this issue is repeated later in her brief, and is considered separately below.

Trenbath completed a "Residual Functional Capacity Assessment" opining that Plaintiff was not capable of performing any full time job, and was "disabled from ALL full time work activity on Feb. 11, 2001, and continu[ing] to [the present] time." As the ALJ determined, the undersigned finds these opinions concern issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 404.1527(e)(1). These opinions therefore cannot be accorded controlling weight or even any special significance.

Plaintiff's argument in particular concerns Dr. Trenbath's opinion that Plaintiff could only infrequently stretch or reach and needed the opportunity to recline during the day.

20 C.F.R. § 404.1527 states:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained

from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The ALJ here specifically recognized Dr. Trenbath's "long treating relationship" with

Plaintiff. She then found, however, that Dr. Trenbath is not a neurologist, a rheumatologist or a

specialist "in any other medical area that would lend greater credence to his opinion, and significantly, neither neurologist who examined the claimant opined that she was incapable of any work." She also found that Dr. Trenbath's diagnoses were "largely based on the claimant's subjective complaints" and that his opinion was "not consistent with the objective medical evidence, which does not support the need to recline or elevate the feet frequently . . . ." This finding comports with the analysis required in the Ruling and is also supported by the record.

Neurologist Dr. Weinstein found Plaintiff had negative straight leg raising, her cervical MRI revealed nothing that caused Plaintiff's "problems," her blood tests "were negative for either a prediabetic condition or a vitamin B-12 deficiency," and her EMG and nerve conduction tests were negative. Dr. Weinstein was "puzzled by what [was] going on and found "nothing . . . to explain her transient weakness and numbness in her lower extremity" (R. 204).

Neurologist Dr. Nevada opined Plaintiff's examination was "essentially normal with the exception of tenderness of lumbar and cervical paraspinal muscles." He observed mild restriction of her lumbar range of motion. Dr. Navada opined Plaintiff's examination was "not suggestive of severe lumbosacral radiculopathy."

Neither of these specialists' opinions, based on examination and testing, support a need to recline during the work day or to limit stretching or reaching to "infrequent." As the ALJ found, Dr. Trenbath's opinion is not supported by the clinical evidence and is inconsistent with other substantial evidence.

"[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996) The undersigned finds substantial evidence supports the ALJ's

48

determination that Dr. Trenbath's opinion was not supported by the evidence and was inconsistent with other substantial evidence, and was therefore entitled to "little weight."

### D. Fibromyalgia/Chronic Fatigue Syndrome/ SSR 99-2p

Plaintiff next argues: "The ALJ failed to evaluate fibromyalgia/chronic fatigue syndrome pursuant to SSR 99-2p." Defendant contends the ALJ properly considered Plaintiff's alleged fibromyalgia. Social Security Ruling ("SSR") 99-2p is entitled: "Policy Interpretation Ruling Titles II and XVI: Evaluating Cases Involving Chronic Fatigue Syndrome (CFS)." There is no evidence in the record that Plaintiff has been diagnosed with chronic fatigue syndrome. There is no indication in the Ruling that it is intended to apply to Fibromyalgia as well as CFS. In fact, the Ruling expressly states:

> [S]everal other disorders (including, but not limited to, FMS [Fibromyalgia Syndrome], multiple chemical sensitivity, and Gulf War Syndrome, as well as various forms of depression, and some neurological and psychological disorders) may share some characteristics similar to those of CFS. When there is evidence of the potential presence of another disorder that may adequately explain the individual's symptoms, it may be necessary to pursue additional medical or other development.

This indicates to the undersigned that the Ruling does not apply to FMS. Additionally, footnote 3 in the Ruling states:

> There is a considerable overlap of symptoms between CFS and Fibromyalgia Syndrome (FMS), but individuals with CFS who have tender points have a medically determinable impairment. Individuals with impairments that fulfill the American College of Rheumatology criteria for FMS (which includes a minimum number of tender points) may also fulfill the criteria for CFS. However, individuals with CFS who do not have the specified number of tender points to establish FMS, will still be found to have a medically determinable impairment.

Here, as the ALJ found, the record does not show that Plaintiff had the "minimum number of tender points" to fulfill the criteria for FMS. Even Dr. Trenbath, her treating physician, was not certain Plaintiff actually had fibromyalgia. She had "possible" fibromyalgia in January 1996; "some

question of whether or not she has fibromyalgia [with] a feeling . . . at the present time she does not seem to have that on examination today since the areas typically tender in fibromyalgia are not tender" in July 2001; a diagnosis of fibromyalgia in September 2001; a diagnosis of fibromyalgia in October 2001, due to "tenderness in various points that are typical of fibromyalgia;" and "unconfirmed fibromyalgia" in December 2002. There is no record that Plaintiff was ever diagnosed with fibromyalgia by a rheumatologist, and there is no finding of the required number of tender points.

20 C.F.R. §404.1508 requires that an impairment result from anatomical, physiological, or psychological abnormalities "that can be shown by medically acceptable clinical and laboratory diagnostic techniques." Further, an impairment must be established by medical evidence that consists of signs, symptoms, and laboratory findings, and not only by an individual's statement of symptoms.

The undersigned finds substantial evidence supports the ALJ's determination that fibromyalgia was not a severe impairment or even a medically determinable impairment.

### E. Hypothetical to the VE

Plaintiff next argues: "The ALJ did not include in the hypothetical question the limitations from the only mental assessments in the record from examining psychologists nor the specific work limitations from the only RFC of the an [sic] examining doctor, the treating physician." In <u>Koonce v. Apfel</u>, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. In <u>Lee v. Sullivan</u>, 945 F.2d 689 (4th Cir. 1991), the Court noted that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by

the evidence, and the vocational expert's testimony in response to the question was without support in the record." The undersigned has already found that substantial evidence supports the ALJ's according Dr. Trenbath's opinion little weight. The undersigned therefore also finds substantial evidence supports the ALJ's rejection of the limitations in Dr. Trenbath's RFC.

As to the "limitations from the only mental assessment in the record from examining psychologists," Plaintiff does not state what limitations those are. In fact, Plaintiff's ARGUMENT section is devoid of any discussion of her alleged mental limitations. The ALJ did find Plaintiff had anxiety and depression, and found those impairments severe. The ALJ then found Plaintiff appeared to have few restrictions in "activities of daily living," but determined she would have a "mild" limitation in this area, noting she cooked full meals, cleaned and vacuumed, did laundry, shopped for groceries, weeded her flowerbeds, took two small grandchildren to a class once a week and cared for them the remainder of the day, went camping and hunting, and shot a deer during the past hunting season.[3] Although these activities had been limited, the record supports a finding that these limitations appeared to be more due to physical impairments than mental.

The ALJ found Plaintiff would have a "moderate" limitation in the area of social functioning, noting that Plaintiff maintained regular contact with relatives and friends, participated in social events at the local volunteer fire department, and served as chaplain of the local fire department, attending meeting two times per month.

The ALJ found Plaintiff had only mild limitations of concentration, persistence or pace, noting that her persistence was consistently rated as normal, pace as fair to normal, and concentration

---

[3]Plaintiff testified she rides to a spot on a 4-wheeler and her sons and husband "bring" the deer to her. She did this seven days in the past year. They all stay in a camper.

average. The ALJ's PRT findings are substantially supported by: 1) Mr. Klein's opinion that Plaintiff's daily activities were "[s]everely restricted <u>due to physical condition</u>" (emphasis added); social functioning was "restricted" but Plaintiff demonstrated good interaction with him during his evaluation; concentration was moderately deficient; persistence was normal; and pace was normal; 2) Dr. Navada's finding that Plaintiff could perform serial 7's; 3) Mr. Morgan's findings that Plaintiff's concentration was within normal limits; persistence was fair; pace was within normal limits; and immediate and recent memories were within normal limits; 4) Dr. Goots's findings that Plaintiff had no restrictions of activities of daily living; no difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation; and 5) Dr. Roman's findings that Plaintiff was mildly restricted in her activities of daily living; moderately limited in her ability to maintain social functioning; and mildly limited in her ability to maintain concentration, persistence, or pace.

Psychologists Steward and Allen-Henderson, on the other hand, opined that Plaintiff would have a "marked" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence or pace, and had had three repeated episodes of decompensation, each of extended duration. These findings are inconsistent with the other substantial evidence of record. As the Fourth Circuit stated in <u>Hays v. Sullivan</u>, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. <u>*King v. Califano*, 599 F.2d 597, 599 (4th Cir.1979)</u> ("This Court does not find facts or try the case *de novo* when reviewing disability determinations."); <u>*Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir.1976)</u> ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); <u>*Blalock v. Richardson*, 483 F.2d at 775</u> ("[T]he language of §

205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

As to particular functional limitations, Steward and Allen-Henderson found Plaintiff would have a "marked" limitation in understanding, remembering, and carrying out detailed instructions; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; demonstrating reliability; and tolerating work stress. She would have moderate limitations in her ability to understand, remember, and carry out short, simple instructions; exercise judgment or make simple work-related decisions; sustain attention and concentration for extended periods; interact appropriately with the public; work in coordination with others without unduly distracting them or being unduly distracted by them; respond to changes in the work setting or work processes; be aware of normal hazards and take appropriate precautions; carry out an ordinary work routine without special supervision; and travel independently in unfamiliar places.

Morgan D. Morgan found Plaintiff had no restriction in her ability to understand, remember, and carry out short, simple instructions; a slight restriction in her ability to understand, remember, and carry out detailed instructions; make judgments on simple work-related decisions; and interact appropriately with the public. Plaintiff was found to have moderate limitations in her abilities to interact appropriately with supervisors; interact appropriately with co-workers; and respond appropriately to work pressures in a usual setting. Plaintiff was found to have a marked limitation in her ability to respond appropriately to changes in a routine work setting.

Frank Roman, Ed.D., found Plaintiff was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; respond appropriately to changes in the work setting; and be aware of normal hazards and take appropriate precautions. She would be moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors. Dr. Roman found Plaintiff demonstrated no evidence of limitation in her ability to get along with coworkers or peers; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel to unfamiliar places; use public transportation; set realistic goals; or make plans independently of others. Dr. Roman opined Plaintiff was able to "perform . . . ADLs & follow 2-3 step work directions in a low stress setting" (R. 306).

Again, these medical reports were inconsistent with each other. The ALJ found Steward/Allen-Henderson's opinions inconsistent with the other evaluations. The undersigned finds substantial evidence supports a finding that Steward/Allen-Henderson's opinion that Plaintiff met the requirements for a mental listing is not supported by the evidence of record. Further, the psychologists' specific limitations are inconsistent with other substantial evidence of record and are not supported by the evidence. Substantial evidence therefore supports the ALJ's determination that

this assessment be accorded very little weight.

Again, it is the ALJ's duty to reconcile inconsistencies in the evidence. See Hayes, supra. The ALJ considered the various mental evaluations in the record and determined that Plaintiff could perform jobs that were low stress, unskilled, routine, repetitive work dealing primarily with things rather than people. The undersigned finds these limitations are in accord with the assessments of Morgan and especially Roman.

The undersigned therefore finds substantial evidence supports the ALJ's hypothetical question to the VE and his determination that Plaintiff could perform a significant number of jobs in the national and regional economy.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not under a disability as defined in the Social Security Act at any time through the date of her decision.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 15] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 11] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this /4 day of August, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE